DA 06-0495

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 232

IN RE THE MARRIAGE OF
DOUGLAS DALE OLSON,

        Petitioner and Appellee,

   and

NOEMI OLIVERIA OLSON, n/k/a NOEMI
OLIVERIA JIJON,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR-03-686
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Shari M. Gianarelli, Attorney at Law, Conrad, Montana

        For Appellee:

        Philip J. O'Connell, Attorney at Law, Missoula, Montana

Submitted on Briefs:  July 11, 2007

Decided:  July 2, 2008

Filed:

_____
                             Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 Noemi Jijon (Noemi) appeals from a decree entered in the Fourth Judicial District Court dissolving her marriage to appellee Doug Olson (Doug), distributing the marital estate, and adopting a parenting plan for their minor child.

¶2 Noemi raises four issues on appeal, which we restate as follows:

¶3 1. Must the decree entered by the District Court be vacated and a new trial ordered because the audio recording of proceedings conducted before a Standing Master did not provide a sufficient record for review by the District Court?

¶4 2. Did the Standing Master and District Court improperly consider Noemi's race or national origin in adopting the parenting plan?

¶5 3. Did the District Court err in the distribution of the marital estate?

¶6 4. Does substantial evidence support the Standing Master and District Court's findings of fact regarding the final parenting plan?

## BACKGROUND

¶7 Noemi and Doug were married in Mexico in 1998. Noemi, a citizen of Mexico, then moved to Montana where Doug resided. In 1999, a daughter, Isla, was born to the couple. Noemi and Doug separated in 2003.

¶8 On October 24, 2003, Doug filed a petition for dissolution of marriage, to establish a parenting plan for Isla, and to distribute the marital estate. The case was referred by the District Court to a Standing Master. Relations between Doug and Noemi had become contentious. Throughout the proceedings, the parties continued to exhibit a high level of

hostility toward each other, and each made numerous accusations about the other's parenting.

¶9      Both parties moved for the appointment of a Guardian ad Litem (GAL). Noemi moved for the appointment of Dr. Paul Moomaw because he speaks fluent Spanish, her command of English is somewhat limited, and he is a qualified mental health professional. Doug objected to the appointment of Dr. Moomaw and nominated two other individuals to serve as GAL. The Standing Master granted Noemi's motion to appoint Dr. Moomaw as GAL.

¶10     On January 27, 2004, the GAL submitted a report to the District Court which recommended that Doug provide the primary residence for Isla and that Noemi have custody of her on the weekends and one night mid-week. He based his recommendation on concerns about the high level of conflict between Doug and Noemi and the need to minimize Isla's transitions between them. He also expressed some concern about the stability of Noemi's job and housing arrangements. The Standing Master adopted the GAL's recommendations. Both parties filed objections to the recommendations.

¶11     In May 2004, Doug and Noemi agreed to an interim parenting schedule under which they would share custody of Isla evenly. However, almost immediately, problems arose in implementing the parenting plan. Noemi and Doug continued to exhibit constant disagreement over the parenting schedule.

¶12     On January 25, 2005, the Standing Master conducted a trial to set a final parenting plan. The record of the trial was made by means of an audio tape recording. At trial, the

3

GAL reiterated his recommendation that Doug be awarded primary custody of Isla, voicing his opinion that Doug would be able to provide more stability for the child and such a plan would be more likely to lessen her exposure to the conflict between her parents. He testified to the high level of on-going conflict between the parents and the extremely negative effect this has on their daughter. He noted that she had functioned better during those times when she was living primarily with one parent instead of being subjected to constant transitions between them. In his opinion, Noemi had contributed more to the on-going conflict than Doug. The GAL expressed concern about Noemi's residential stability and about her current boyfriend's contact with Isla. The GAL also remarked that Doug should serve as the primary parent because he is American and could integrate Isla into the community better than Noemi, who is Mexican.

¶13 The director of Isla's preschool also testified about the strong bond and positive relationship she had witnessed between Doug and his daughter. She stated that she had not had as much experience with Noemi, but recalled some incidents were Isla was reluctant to leave the school either with Noemi or Noemi's boyfriend.

¶14 Doug and Noemi both testified at the trial. Each indicated a strong desire to be the primary caretaker of their daughter, and both parents continued to make accusations about the other's actions and parenting abilities. They also disagreed about the disposition of their assets, particularly the proceeds from the sale of a house they had bought and sold during the marriage.

¶15 On March 9, 2005, the Standing Master issued her Recommended Findings of Facts, Conclusions of Law, and Decree of Dissolution. She adopted the recommendations of the GAL, finding that Doug should be the primary custodial parent and Noemi should have visits with their daughter on alternating weekends and one day during the week. In addition, the Standing Master recommended that Noemi and Doug more equally share parenting time with the child over the summer.

¶16 The Standing Master's findings of fact and recommendations concerning the distribution of the marital estate were that the $18,000 proceeds from the sale of the house should be divided evenly between the parties. Based on Noemi and Doug's testimony, the Standing Master found that Noemi had previously received $3,500 of the $9,000 to which she was entitled from the house sale and Doug had kept the remainder. However, the findings went on to recommend that Doug pay Noemi only an additional $3,500 to fulfill his obligation to equalize the distribution of the proceeds from the sale of the house.

¶17 Noemi claimed that she was unable to find a court reporter who could transcribe the tapes from the trial before the Standing Master. She moved for a new trial based on the lack of an adequate record. In its order denying Noemi's motion for a new trial, the District Court stated that it had reviewed the tapes and found them to be adequately clear and comprehensible. While the District Court noted some problems with the tapes, it found that overall they were audible and provided a sufficient record of the hearing.

¶18 Noemi then filed objections to the Standing Master's recommendations. She again asserted that the tapes provided an insufficient record. She also argued that the Standing

5

Master's findings regarding the parenting plan were erroneous and that the Standing Master had impermissibly taken into account her race and national origin in establishing the parenting plan.

¶19 On June 13, 2006, the District Court entered a final decree dissolving the parties' marriage, distributing the marital estate, setting child support, and establishing a parenting plan. The District Court's decree denied all of Noemi's objections to the Standing Master's recommendations and reiterated its finding that the tapes of the trial were adequate. The District Court then adopted in full the recommendations of the Standing Master. Noemi filed a timely appeal.

## STANDARD OF REVIEW

¶20 We review a district court's findings of facts, including the facts underlying the division of marital assets and a parenting plan, to determine if they are clearly erroneous. *In re Marriage of Bock*, 2005 MT 40, ¶ 14, 326 Mont. 123, ¶ 14, 107 P.3d 488, ¶ 14; *In re Marriage of Herrera*, 2004 MT 40, ¶ 18, 320 Mont. 71, ¶ 18, 85 P.3d 781, ¶ 18. A finding is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or our review of the record convinces us the district court made a mistake. *Herrera*, ¶ 18. We review a district court's conclusions of law to determine if they are correct. *In re Marriage of O'Moore*, 2002 MT 31, ¶ 8, 308 Mont. 258, ¶ 8, 42 P.3d 767, ¶ 8. Our review of constitutional questions is plenary. *State v. Ellis*, 2007 MT 210, ¶ 10, 339 Mont. 14, ¶ 10, 167 P.3d 896, ¶ 10.

## DISCUSSION

6

**Issue 1**

¶21 **Must the decree entered by the District Court be vacated and a new trial ordered because the audio recording of proceedings conducted before a Standing Master did not provide a sufficient record for review by the District Court?**

¶22 A district court may refer a case to a standing master and direct the master to present findings of fact and conclusions of law to the district court. Section 3-5-124(1), (2)(a), MCA. A standing master is required to preserve an adequate record of the proceedings:

> The standing master shall make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in the Montana Rules of Evidence for a court sitting without a jury. Audio and video recordings are acceptable means of record so long as a master recording is properly preserved and can be transcribed for district court and appellate review.

Section 3-5-124(2)(c), MCA.

¶23 "[A] reviewing court must have a record of the lower court proceedings when determining whether the lower court's findings of fact are clearly erroneous." *Spence v. Ortloff*, 271 Mont. 533, 535, 898 P.2d 1232, 1233 (1995). Without an adequate record, a reviewing court, such as the District Court in this case, does not have a sufficient basis on which to determine whether the findings of fact are clearly erroneous. *Spence*, 271 Mont. at 535, 898 P.2d at 1233. However, a record need not be perfect and may be incomplete, provided it is sufficient for a district court to review. *City of Billings v. Peterson*, 2004 MT 232, ¶ 18, 322 Mont. 444, ¶ 18, 97 P.3d 532, ¶ 18. An appellant must make some showing

7

that a more complete record would demonstrate an error to the reviewing court. *Billings*, ¶ 19.

¶24 We conclude that the audio recording provided a sufficient record for the District Court to review. The record before this Court indicates that the District Court reviewed the tapes of the trial before the Standing Master and made an explicit finding that the record was adequate. The District Court's order of December 19, 2005, found that the tapes were clear and comprehensible overall, and the final order dissolving the parties' marriage and establishing the parenting plan echoed this finding. The order noted two problems with the tapes: first, that one of the tapes seemed to duplicate another and, second, that one of the tapes contained inaudible material mistakenly recorded during a break in the proceedings. The District Court found, and our review confirms, that these problems did not prevent the tapes from being transcribed, and the tapes, despite some imperfections, provided an adequate record for the District Court to review. *See Billings*, ¶ 18.

¶25 Noemi has offered no evidence to the District Court that she was prejudiced by the allegedly inadequate record. Instead, she argues that this Court should adopt a policy of automatic reversal when a record is incomplete. As stated in *Billings*, merely asserting that the record is incomplete without a showing that a more complete record would demonstrate an error, is not a sufficient basis to reverse the District Court's finding that the record is sufficient. *Billings*, ¶ 19.

¶26 The District Court's determination that the audio tapes of the proceedings before the Standing Master were sufficient is supported by the record. The District Court did not err by adopting the Standing Master's recommendations based on the record before it.

**Issue 2**

¶27 **Did the Standing Master and District Court improperly consider Noemi's race or national origin in adopting the parenting plan?**

¶28 The Montana Constitution guarantees that the State will not discriminate against someone because of her race. Mont. Const. art. II, § 4. Constitutional requirements of equal protection prohibit courts from relying on race to make decisions regarding child custody. *Palmore v. Sidoti*, 466 U.S. 429, 434, 104 S. Ct. 1879, 1882 (1984). This Court cannot and will not condone the consideration of race or national origin in establishing a parenting plan.

¶29 In the case before us, we conclude that the Standing Master and District Court did not impermissibly take into account Noemi's race and national origin when establishing the final parenting plan. Nothing in the Standing Master's proposed findings suggests that Noemi's ancestry or her status as a Mexican citizen led to the finding that Doug should be the primary caretaker of the couple's daughter. As discussed more fully below in Issue 4, the Standing Master made detailed findings on a number of factors that led to her recommendation that Doug should serve as the primary custodial parent, and none of these factors involved Noemi's race or national origin.

¶30 The GAL did make a statement that suggested Isla would be better integrated into the community by living with her American father rather than with her Mexican mother. This

opinion is not an acceptable basis for a parenting plan. However, as stated above, there is no evidence in the record that either the Standing Master or the District Court relied upon or considered this single statement in designating Doug as the child's primary caregiver. We will not reverse the District Court's decree based on a single statement by a witness when there is no indication that the statement was part of the rationale underlying the District Court's decision.

### Issue 3

¶31 **Did the District Court err in the distribution of the marital estate?**

¶32 Noemi argues the Standing Master made a mathematical error in distributing the proceeds from the sale of the couple's house. If a district court makes a mathematical error in distributing property, we will remand for the district court to amend the judgment to reflect the correct amount. *In re Marriage of Dahm*, 2006 MT 230, ¶ 38, 333 Mont. 453, ¶ 38, 143 P.3d 432, ¶ 38.

¶33 The record affirmatively shows that the sale of Doug and Noemi's home generated proceeds of $18,000, and the decree intended that this amount be divided evenly, with each party receiving $9,000. The District Court found that Noemi had received $3,500 of her share. Thus, to receive her one-half share of $18,000, Noemi was owed an additional $5,500. However, the decree orders that Doug pay her only $3,500. The decree contains a mathematical error in the amount Doug is obligated to give Noemi. We must reverse and remand the decree for correction of the error. *Dahm*, ¶ 38.

### Issue 4

¶34 **Does substantial evidence support the Standing Master and District Court's findings of fact regarding the final parenting plan?**

¶35 Noemi asserts that the District Court's findings of fact regarding the parenting plan are not supported by substantial evidence in the record. We disagree.

¶36 Section 40-4-212(1), MCA, requires district courts to establish parenting plans based on the best interest of the child, as determined by a wide range of factors listed in the statute. When the evidence presented furnishes reasonable grounds for different conclusions, we defer to a district court's discretion in establishing an appropriate parenting plan because the district court is in a better position to resolve such conflicts. *Toavs v. Buls*, 2006 MT 68, ¶¶ 9, 13, 331 Mont. 437, ¶¶ 9, 13, 133 P.3d 202, ¶¶ 9, 13.

¶37 The Standing Master's proposed findings of fact, which were adopted by the District Court, considered every factor listed in § 40-4-212(1), MCA. While the evidence was conflicting, the decision of the Standing Master, adopted by the District Court, finds support in the record.

¶38 Noemi argues that she should be the primary parent because the Standing Master found that she had spent more time with their daughter during the marriage. However, the Standing Master also found that Doug is a devoted parent, and the GAL report stated that both parents were very involved in Isla's life and she was very attached to both of them. The GAL report focused on the high level of on-going conflict between Noemi and Doug and the excessive stress placed on Isla when she has to transition between them frequently. The GAL report suggested that Noemi was the primary source of tension between the parties,

11

even though Doug was not without fault. The Standing Master concluded that Isla would suffer fewer negative consequences by having a primary caretaker rather than having to constantly shift between her parents. The director of Isla's daycare also testified that Doug and his daughter seemed to have a very strong and positive relationship. Such evidence, as discussed in the Standing Master's recommendations, provides adequate support for the final parenting plan.

¶39 Finally, Noemi argues that the District Court's decision that the parties should evenly split time with their child over the summer months is unsupported since Noemi has less parenting time during the school year. This matter is within the discretion of the District Court. The evidence presented at trial provided grounds for different conclusions, and under such circumstances we will not disturb the finding that Doug and Noemi should share parenting time in the summer. *Toavs*¸ ¶¶ 9, 13.

¶40 The Standing Master's recommendations regarding the final parenting plan, as adopted by the District Court, were supported by substantial evidence. The District Court did not err in adopting the Standing Master's recommendations.

## CONCLUSION

¶41 We reverse and remand for the District Court to amend the decree distributing the marital estate to reflect the correct amount that Doug must pay Noemi. We affirm the judgment in all other respects.

/S/ JOHN WARNER

12

We Concur:


/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS